**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| RUSSELL E. GRAY III, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff | ) ) ) ) ) | **FLSA COLLECTIVE ACTION COMPLAINT UNDER 29 USC § 216(b)** |
| vs. | ) ) | CASE NO.  2:21-cv-346 |
| DANISCO USA, INC., | ) ) ) | |
| Defendant | ) | |

*PLAINTIFF'S FLSA COLLECTIVE ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF AND REQUEST FOR TRIAL BY JURY*

### *I.  INTRODUCTION*

Plaintiff Russell E. Gray III ("Gray") was wrongfully terminated from employment by Defendant Danisco USA, Inc. ("Danisco") on August 20, 2021.  In this action, Gray will individually pursue claims against Danisco for breach of contract and violations of his rights under the Family and Medical Leave Act ("FMLA").

Additionally, in this action, Gray is pursuing individual and collective action claims against Danisco to address class-wide overtime violations committed by Danisco against Gray and all of its other hourly paid employees who were also paid earned wages in three categories Danisco called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1."  Gray will serve as the representative plaintiff in the FLSA collective action.

Specifically, Danisco is and has been underpaying overtime compensation to its hourly-

paid employees on a systematic, class-wide basis as a result of an unlawful practice by which Danisco is failing to include all of its employees' earned wages in its calculation of employees' regular rates of pay and, in so doing, is failing to include all earned wages in its calculation of its employees' overtime rate of pay.  All hourly-paid employees who earned wages one or more times in the last three years in one or more of the three categories Danisco called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" were and are being similarly subjected to Danisco's unlawful compensation scheme.

To explain generally, Gray and all similarly situated Danisco employees around the country regularly earn a portion of their wages through payments Danisco calls 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1." These three types of payments are earned wages paid on a regular basis.  These three types of payments are promised beforehand, expected and are in no way gratuitous or discretionary. Danisco is paying overtime compensation to hourly paid employees, but it is not including in the regular rate of pay the wages it calls 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1."  In so doing, it is not paying overtime wages at the full overtime rate of pay.  This class-wide and systematic failure and refusal to include the earned 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" wages in the calculation of hourly employees' regular rates of pay violates the Fair Labor Standards Act ("FLSA") and results in class-wide underpayment of overtime compensation.

Gray's collective action claims based upon Danisco's failure to include earned wages it calls 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and

3) "R. AwdGl 1" in the calculation of regular rates of pay and overtime rates of pay will be perfect for collective action treatment and will be easy to prove.  All of Danisco's overtime violations will be shown on the face of pay stubs Danisco issues to its hourly paid employees.

## II.  FACTUAL ALLEGATIONS

1. Gray is a resident of the State of Indiana and is domiciled in Terre Haute, Vigo County, Indiana.  Gray was initially hired through a temporary employment agency to work for Danisco's predecessor company, Pfizer, Inc., in July 1995.  His employment became permanent in December 1995.  Gray did good work at all times for Danisco (and its predecessors) and was heavily relied upon to work substantial hours, including overtime hours.  In his last position, Gray was assigned to work as a "1196 APO," which is an advanced process operator.  Just prior to that, Gray had worked many years as a material expediter.  For improper and unlawful reasons explained in more detail below, Danisco involuntarily terminated Gray's employment on August 20, 2021.

2. At all times during his employment with Danisco and its predecessors, Gray was paid wages on an hourly basis and treated as a non-exempt employee.

3. Based upon information and belief, Danisco is headquartered in and has its principal place of business in Gardner, Kansas. Danisco's state of incorporation was the State of Missouri.  Danisco is a citizen of the State of Kansas and a citizen of the State of Missouri. Danisco is in the food industry.  Based upon available information, Danisco appears to employ hourly paid workers at its plants in Indiana, Illinois and Wisconsin.

### A.  FACTS SPECIFIC TO FLSA OVERTIME CLAIMS

4. Throughout his employment with Danisco and its predecessor companies, Gray

3

was a non-exempt employee who was compensated by Danisco on an hourly-paid basis.  At the time of his termination, Gray's base rate of pay was $34.98 per hour.  Prior to that time, Gray's base rate of pay had been $34.13 per hour.  During his employment with Danisco, Gray regularly worked significant overtime hours (in excess of forty hours in a seven day work week).

5.      When Danisco paid Gray overtime compensation, it failed to include other categories of wages Danisco called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" in Gray's regular rate of pay and, in so doing, failed to include those categories of wages in the calculation of Gray's overtime rates of pay. This resulted in Danisco's failure to pay Gray his overtime wages at his full overtime rate of pay.[1]

6.      Danisco's failure to include earned categories of wages it called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" in Gray and all of his similarly situated coworkers' regular rates of pay, resulted in the underpayment of Gray and his similarly situated coworkers' overtime compensation in corresponding weeks, causing systematic and class-wide violations of the FLSA.  Gray will provide additional details about each category of wages in the paragraphs below.

7.      Throughout most of his last three years of employment with Danisco, Gray was paid a small, bi-weekly (every pay check for a two week pay period) amount of wages Danisco called "Healthy Inc Credit" aka "HIMedCr."  During 2020, that "Healthy Inc Credit" aka "HIMedCr" payment ranged from $17.78 to $18.46 for the two week pay period.  During most

---

[1]Danisco paid Gray one other type of earned wage in a category it called "OnCall."  From Gray's pay stubs, it appears Danisco did include the "OnCall" wages in Gray's regular rate and Gray's overtime compensation.  Gray is not making a claim against Danisco based upon the "OnCall" category of pay.

of the work weeks covered by the "Healthy Inc Credit" aka "HIMedCr" payments, Gray worked significant overtime hours (hours in excess of forty (40) in the work week. These "healthy living" wages Danisco called "Healthy Inc Credit" aka "HIMedCr" were paid based upon a promise made to Gray (and Danisco's other employees) in exchange for certain healthy behaviors (e.g., abstaining from smoking cigarettes, exercise) and reports to the company about the employees' health and healthy choices. The "Healthy Inc Credit" aka "HIMedCr" were based upon objective criteria and were regularly (bi-weekly) paid. The "Healthy Inc Credit" aka "HIMedCr" were not discretionary payments. The "Healthy Inc Credit" aka "HIMedCr," were definitely wages paid to induce Gray (and other Danisco employees) to work more steadily and efficiently, and the "Healthy Inc Credit" aka "HIMedCr" were certainly wages paid as consideration for certain specific employee behavior, to wit, more healthy living. These "Healthy Inc Credit" aka "HIMedCr" were a small, lesser component of Gray's compensation.

8.      Danisco did not include Gray's "Healthy Inc Credit" aka "HIMedCr" wages in its computation of Gray's overtime wages. This same failure was true for every other Danisco employee paid in the category called "Healthy Inc Credit" aka "HIMedCr." Specifically, Danisco did not include Gray's "Healthy Inc Credit" aka "HIMedCr" wages in its calculation of his regular rate of pay before calculating his overtime rate of compensation in weeks in which Gray worked more than forty (40) hours, was owed overtime compensation and was also paid the wage Danisco called "Healthy Inc Credit" aka "HIMedCr." This failure to include "Healthy Inc Credit" aka "HIMedCr" in overtime compensation is readily seen in the pay stubs Danisco issued to Gray and Danisco's other hourly paid employees.

9.      Gray can provide a specific example from 2020. During the pay period from

September 7, 2020 to September 20, 2020, Gray worked 101.00 hours.  Danisco's pay stub indicates that 29.00 of those 101.00 work hours were overtime hours during this two week pay period.  Gray was paid at his base rate of $34.13 for all 101.00 hours worked in that two weeks. Gray was paid an additional overtime premium of $17.07 for each of the 29.00 overtime hours. The overall overtime rate Gray was paid was $51.20 per hour and was equal to an amount that was one and one-half times Gray's base rate of pay.  Gray was also paid $17.78 in the category of "Healthy Inc Credit" aka "HIMedCr."  This $17.78 amount was not included in Gray's regular rate and, more specifically, was not included in Gray's overtime rate of pay for the 29.00 overtime hours.  At a minimum, Gray's regular rate of pay should have been adjusted to $34.31 per hour ($.18/hour higher) and his overtime rate should have been adjusted to $51.47 per hour ($.27 per overtime hour higher).  This adjustment should have been made every week Gray worked overtime hours and was also paid "Healthy Inc Credit" aka "HIMedCr" wages.  The failure to include the "Healthy Inc Credit" aka "HIMedCr" in the calculation cost Gray and every similarly situated Danisco coworker overtime compensation on a regular basis.  While this one week amount may seem small, this failure to pay overtime in full occurred over many weeks in many years and caused Gray and his Danisco coworkers to lose significant overtime wages.

10.     In the wage category Danisco called  "LPBC Annual - Acti" or "LPBCAnnA," Gray was paid a one time payment of $3,793.13 on March 13, 2020 and a similar one time payment of $6,443.69 on January 29, 2021.  This "LPBC Annual - Acti" or "LPBCAnnA" wage was based upon Gray's wage rate and Gray's hours, along with a metric for meeting Danisco goals for the year.  The "LPBC Annual - Acti" or "LPBCAnnA" wage was promised or announced in advance and paid to Gray and all similarly situated Danisco hourly employees to

induce them to work more steadily, more rapidly and more efficiently.  The "LPBC Annual - Acti" or "LPBCAnnA" is a wage that had to be included somehow in Gray and his similarly situated Danisco coworkers' regular rates of pay and corresponding overtime rates of pay, as the "LPBC Annual - Acti" or "LPBCAnnA" was given as a reward for specific employee behavior pursuant to an agreement or understanding with Danisco.

11.     Danisco failed and refused to include "LPBC Annual - Acti" or "LPBCAnnA" in payment of Gray or any other Danisco employees' regular rate of pay and corresponding overtime rate of pay in any fashion - either in one work week or in the form of reconciliation or recalculation of overtime for the entire calendar year.  To provide specific examples, Danisco did not in any way include in Gray's regular rate, nor did it make any annualized reconciliation payment of overtime to Gray in calendar year 2020 when it paid Gray the "LPBC Annual - Acti" or "LPBCAnnA" payment of $3,793.13 on March 13, 2020.  This can be confirmed by review of all of Gray's 2020 pay stubs from Danisco.  In the same way, Danisco did not in any way include in Gray's regular rate, nor did it make any annualized reconciliation payment of overtime to Gray in calendar year 2021 when it paid Gray the "LPBC Annual - Acti" or "LPBCAnnA" payment of $6,443.69 on January 29, 2021.  This can be confirmed by review of all of Gray's 2021 pay stubs from Danisco.

12.     In the same manner described for Gray, Danisco failed to include in the regular rate or pay corresponding overtime to all other employees who similarly worked overtime and were paid "LPBC Annual - Acti" or "LPBCAnnA" wages.  This has resulted in significant underpayment of overtime to Gray and his similarly situated coworkers over many years.

13.     In the wage category Danisco called "R. AwdGl 1," Gray was paid a one time

7

payment of $500.00 on June 19, 2020.  This "R. AwdGl 1" was based upon Gray's work.  The "R. AwdGl 1" wage was promised or announced in advance and paid to Gray and all similarly situated Danisco hourly employees to induce them to work more steadily, more rapidly and more efficiently.  The "R. AwdGl 1" is a wage that had to be included somehow in Gray and his similarly situated Danisco coworkers' regular rates of pay and corresponding overtime rates of pay, as the "R. AwdGl 1" was given as a reward for specific employee behavior pursuant to an agreement or understanding with Danisco.

14.     Danisco failed and refused to include "R. AwdGl 1" in payment of wages to Gray or to any other Danisco employees' regular rate of pay and corresponding overtime rate of pay in any fashion - either in one work week or in the form of reconciliation or recalculation of overtime for the entire calendar year.  To provide specific examples, Danisco did not in any way include in Gray's regular rate, nor did it make any annualized reconciliation payment of overtime to Gray in calendar year 2020 when it paid Gray the "R. AwdGl 1" payment of $500.00 on June 19, 2020.  This can be confirmed by review of all of Gray's 2020 pay stubs from Danisco.

15.     In the same manner described for Gray, Danisco failed to include in the regular rate or pay corresponding overtime to all other employees who similarly worked overtime and were paid "R. AwdGl 1" wages.  This has resulted in significant underpayment of overtime to Gray and his similarly situated coworkers over many years.

16.     Danisco has created a policy and practice whereby it significantly underpays its non-exempt, hourly paid employees overtime compensation by failing to properly include wages Danisco calls 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or

8

"LPBCAnnA," and 3) "R. AwdGl 1" in regular rates of pay and by failing to properly calculate overtime hours and overtime rates of pay required by the FLSA.

17.     Based upon its long-standing policy and practice of improperly calculating overtime compensation, Danisco has been systematically underpaying its non-exempt, hourly paid employees significant sums of overtime wages on a weekly basis.  The aggregate sum of unpaid overtime for all hourly Danisco employees is very substantial on a weekly and on an annual basis.

18.     Based upon information and belief, particularly when including employee turnover, Gray estimates that Danisco applied its unlawful method of calculating and paying employees for overtime hours of work in a manner that affects five hundred or more employees over a three year period.

19.     Danisco has intentionally, knowingly, with reckless disregard and systematically violated Gray and his similarly situated Danisco coworkers' rights to earned overtime through Danisco's unlawful overtime calculation and payment policies.

### B.  FACTS SPECIFIC TO GRAY'S BREACH OF CONTRACT CLAIM

20.     Gray worked for Danisco and its predecessor companies at the Terre Haute, Indiana plant for more than twenty-five (25) years.  Gray always did good work and he was heavily relied upon by Danisco, its supervisors and his coworkers.  Within the last approximately two years, Danisco placed a new plant manager, Kal Pyada, and a new operations manager, Jim Crutch, in charge of the Terre Haute facility and, in doing so, in charge of Gray's employment. This is the genesis of Gray's work problems and his ultimate termination.

21.     On July 27, 2021, Gray was presented a "Last Chance Agreement" by his

Operations Manager, Jim Crutch.  Gray was told he had to sign the agreement or he would be

terminated.  The underlying basis Danisco claimed for the Last Chance Agreement, is untrue, is

disputed by Gray, and is not the legitimate basis for any employee discipline, but Gray did, in

fact, sign the Last Chance Agreement.  Once signed, the Last Chance Agreement became the

contract that governed Gray's employment with Danisco.  In relevant part, the July 27, 2021 Last

Chance Agreement read as follows:

> "Our outcome with paperwork falsification would normally be immediate termination. Given your long career at Litesse, in lieu of termination, you will accept a new role as 1196C APO, where you can maintain employment and rebuild trust with your team. This role would also allow you to retain your current rate of pay. It is further expected that you will help develop Litesse specific documentation completion training and provide training that in 5th Crew to your peers.

> You have been placed on this Last Chance Agreement is for one year which details the specific expectations regarding correcting, improving, and sustaining satisfactory behavior.

> You are required to:

> 1.     Comply with all Company and Plant Policies & Procedures

> 2.     Adhere to the Company's Core Values

> 3.     Complete Litesse documentation's individual step sign-of at the time the activity, task, or observation is completed and not take shortcuts like pre-filling or post-filling in the individual sign-off.

> 4.     Not exhibit disrespectful and/or retaliatory behavior (overt or subtle) towards the company, immediate supervisor and manager, any other employee, contractor, supplier, or vendor. Disrespectful behavior includes speaking despairingly or negatively with others or in written communication. You are expected to learn from the mistake and have a positive attitude towards rebuilding trust with your team.

> 5.     Move into the 1196C APO role opening. Assist in the developing Littese specific documentation completion training and train your peers in 5th Crew.

> It is important for you to understand that based upon the severity of your most recent

performance/behavior and the adverse impact on the organization as a whole, the Company can discharge you today and in the future for any misconduct, policy violation, or unacceptable job performance. You can not have any instances of inappropriate performance/behavior that is substantiated or otherwise concluded as inappropriate.

This is your last chance to retain your employment with IFF. By signing this letter, you acknowledge and agree that any further acts of unsatisfactory job performance including unacceptable behavior, poor judgment, and lack of leadership will result in discharge from the Company.

I want you to be successful and I willing to work with you to help you improve your job performance."

A copy of the entire July 27, 2021 Last Chance Agreement is attached hereto as Exhibit 1.

22.     Danisco's "Last Chance Agreement" with Gray is an enforceable contract of employment.  The contract has a specific term - one year.  The contract was offered as a specific condition of Gray's continued employment, by Danisco, and Gray accepted.  Danisco signed and dated the agreement, by Jim Crutch.  Gray signed and dated the agreement.  The agreement promised a specific job - "1196C APO" - which Gray accepted.  The agreement promised specific pay - "this role would also allow you to retain your current rate of pay" - which was $34.98 per hour.  The agreement listed five (5) specific expectations Gray was required to meet. Regarding those five listed conditions, the language of the Last Chance Agreement states "You can not have any instances of inappropriate performance/behavior that is substantiated or otherwise concluded as inappropriate."  For a period of one year from July 27, 2021 to July 26, 2022, the terms and conditions of Gray's job with Danisco, including the rules he must follow and the terms under which Danisco could terminate Gray's employment, were all committed to the contract and mutually agreed upon.

23.     After accepting and signing the Last Chance Agreement, Gray continued to work for Danisco, did good work, and complied with every term and provision of the Last Chance

11

Agreement.

24.    Danisco terminated Gray on August 20, 2021 without cause or explanation. Particularly because he was promised a set of conditions for continuing his employment, Gray asked his Danisco supervisors to tell him a reason he was being terminated, so that Gray could defend himself or seek to save his job.  Indeed, the language of the July 27, 2021 Last Chance Agreement itself promised Gray that he would be fired only if a claimed violation of the Last Chance Agreement's provisions by Gray was "substantiated" or "otherwise concluded as inappropriate."  Danisco would not and, to this day, has not claimed a reason and has not claimed a provision of the Last Chance Agreement that it believes Gray breached or violated. The individuals from Danisco who telephoned Gray and terminated Gray's employment were Kal Pyada and Carla Warden, a Danisco Human Resources Manager.  Kal Pyada went so far as to expressly tell Gray that he and Ms. Warden were not going to tell Gray a reason for his termination and they were not going to discuss it with him.  This telephone call telling Gray he was fired, was made by Danisco to Gray at 3:02 p.m. on August 20, 2021.  The timing of this call is important and highly suspect, because Gray sent an email to Carla Warden and Marissa Franks (another Human Resources employee) at 2:34 p.m. on August 20, 2021 asking them to provide him a FMLA application.

25.    Danisco breached its Last Chance Agreement with Gray.  Danisco did not have the right to terminate Gray without cause or without explanation, at least for the one year contractual term of the Last Chance Agreement.  On August 20, 2021, Gray had at least 341 days (11 months and 1 week)  remaining on his term contract.  At a minimum, Danisco owes Gray the value of his lost wages and benefits for this 341 days remaining under his one year contract.

26.     Gray is seeking all available damages, including all contractual damages, including all lost wages and benefits.

### C.  FACTS SPECIFIC TO GRAY'S FMLA INTERFERENCE CLAIM

27.     Gray is pursuing claims against Danisco for its violations of his rights under the FMLA, based upon his own serious health condition.  Gray's FMLA claim against Danisco is based upon Danisco's violation of Gray's substantive rights (e.g., interference with Gray's right to use FMLA leave).

28.     At all times during his employment, Gray did good work and met all of Danisco's reasonable expectations.

29.     Gray has a history of knee injuries and surgeries.  Approximately one year ago, in 2020, Gray injured his left knee.  The injury to his left knee was so serious that Gray's physicians eventually told Gray that he would need surgery to repair his knee and some time off work for rehabilitation and recovery.  For a period of almost one year, Gray postponed his knee surgery and he continued to do his work for Danisco.

30.     Over the course of Gray's last year working for Danisco, Gray told a significant number of his coworkers about his left knee injury and his plan to take off work to have knee surgery.  Included in this list of coworkers was Gray's immediate supervisor (line supervisor) Troy Sharp.  Gray also walked at times with a noticeable limp and had been wearing a knee brace while working.

31.     Close in time to his August 20, 2021 termination, Gray had been attending doctor's appointments to diagnose his knee and to make plans for Gray's knee surgery.

32.     By August 17, 2021, prior to any action being taken to suspend or terminate Gray

from employment, Gray learned with certainty that Operations Manager Jim Crutch had learned

that Gray was going to take medical leave to have his knee surgery.  Gray learned about Mr.

Crutch from his supervisor, Troy Sharp.  In a phone call on August 17, 2021, Mr. Sharp told

Gray that Sharp had been in a meeting with Jim Crutch in the office and that Mr. Crutch had

been complaining about the fact that the Terre Haute plant would be short handed because of

employee medical leaves and pending retirements.  Specifically, Mr. Sharp told Gray that Mr.

Crutch complained: 1) Lee Jett (lead operator) was leaving for a September 3rd elbow surgery; 2)

Paul French was retiring on September 6th; 3) Gabe Dunivan was going on medical leave for gall

bladder surgery; and 4) Crutch told Sharp he heard that Rusty (Rusty Gray) was getting ready to

go on leave for knee surgery.

33.     The very next day after Crutch's conversation with Troy Sharp about Gray's

medical leave plan, Kal Pyada sent Gray home from work, without an explanation, and

suspended Gray with pay.

34.     After his bad experience with Mr. Crutch and the pretextual Last Chance

Agreement, Gray began the process of applying for FMLA leave to have his knee surgery and

sufficient time off from work to get knee surgery.  As described above, in an email to Carla

Warden and Marissa Franks (another Human Resources employee) sent at 2:34 p.m. on August

20, 2021, Gray asked Danisco to provide him a FMLA application.  Less than 30 minutes later,

at 3:02 p.m., Gray was called by Danisco Plant Manager Kal Pyada and fired, but Mr. Pyada

refused to provide any reason or explanation, verbal or in writing.

35.     Gray does not have concrete evidence comparable to his August 17, 2021 call

with Troy Sharp that Danisco management (particularly Jim Crutch and Kal Pyada) knew Gray

planned to have knee surgery and to take medical leave prior to the July 27, 2021 "Last Chance

Agreement," but Gray suspects so and will explore this issue in discovery.  Gray particularly

suspects his injury and need for surgery and leave motivated Danisco's swift actions to destroy

his 25+ year career because 1) Gray's job had never been in any jeopardy prior to late July 2021;

and 2) even in the first half of 2021, Danisco needed Gray's work so much that Gray had

stretches where he worked 30 or more straight days without a day off from work.

36.     Gray does know that he was fired within 30 minutes of requesting a FMLA

application.  This knowledge is bolstered by the fact that Danisco tied itself (and Gray) to

conditions in the Last Chance Agreement that governed Gray's continuing employment and that

Danisco promised it would fire Gray under the terms of that Last Chance Agreement only if

Gray violated a term and that violation of the agreement was substantiated.  When Gray sought

to defend his job or ask for a reason, Kal Pyada insisted that he would not give Gray a reason or

even discuss the matter with him.

37.     Gray is expressly asserting that Danisco, acting by and through Mr. Crutch, Mr.

Pyada and Danisco's human resources department, terminated Gray or were motivated to

terminate Gray in order to interfere with Gray's impending use of FMLA-protected medical

leave to have a knee surgery and to have likely several weeks off from work to recover from the

knee surgery.

38.     All of Danisco's reasons for terminating Gray's employment are illegal and

violate the FMLA.  Gray has been significantly harmed by Danisco's violations of his FMLA

rights and its termination of his employment.  Gray is seeking all lost wages and benefits, all

liquidated damages, reinstatement or front pay and benefits, payment of all of his reasonable

15

attorney's fees, costs and expenses, plus any equitable relief which would make him whole.

### III.  FLSA COLLECTIVE ACTION ALLEGATIONS

39.     Gray incorporates herein by reference paragraphs 1 - 38 above.

40.     This Complaint is brought as a collective action under the FLSA on behalf of Gray and other current and former Danisco hourly-paid workers who were similarly denied payment of wages and overtime compensation under Danisco's compensation scheme that involved the improper calculation of regular rates of pay needed to properly calculate overtime rates of pay (which resulted in the underpayment of overtime compensation).

41.     This action is filed as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act, 29 USC § 216(b), on behalf of Gray and all Danisco current and former hourly-paid employees who were damaged by Danisco's compensation system which required and resulted in unpaid or underpaid overtime work.  By virtue of the "collective action," Gray represents the identical and/or similar interests of former and current hourly-paid employees managers denied full overtime compensation under the same circumstance.  Gray anticipates that other Danisco employees and former employees will opt in to the action.

42.     The number of Danisco current and former employees who will be members of this collective action is so great that joinder of all members is impractical.  Instead, Gray will pursue discovery to obtain the names of the other current and former Danisco employees who were paid wages in categories Danisco called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and/or 3) "R. AwdGl 1," to provide notice of the collective action, and to offer the opt-in opportunity.

43.     Particularly with the types of overtime wage claims and practices at issue in this

case, there are questions of law and fact that are common to the entire collective group.

44.     Gray's claims are typical of the claims of the whole collective group of current and former hourly-paid employees harmed by Danisco's illegal overtime calculation and payment practices.

45.     Gray will act to fairly and adequately protect the interests of the entire collective group of current and former Danisco hourly paid employees.

46.     A collective action is superior to other available means for the fair and efficient prosecution of these wage claims against Danisco.  For example, to prove Danisco's illegal overtime practices, Gray and other members of this collective group would seek in discovery records about all similarly situated current and former Danisco hourly paid workers who were paid in wage categories Danisco called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and/or 3) "R. AwdGl 1," and who were similarly denied earned overtime compensation.  Individual lawsuits by the members of the collective group could lead to 1) inconsistent or varying outcomes in the cases, 2) duplicitous discovery, or 3) competition for limited funds.  Further, as a practical matter, the first litigant to trial may achieve a result which would have bearing on all of the other individuals in the group.

47.     A determination regarding the "similarness" of those able to participate in the collective action would also allow litigation of claims that may not otherwise be cost effective, depending upon the amount of each individual group member's damages.  Particularly with the type of FLSA wage violations at issue in this litigation, some, if not most, of the individual group members may not be aware of their rights to their wages under the FLSA, or may not, because of financial means or experience, be in a position to seek the assistance of counsel to

17

commence individual litigation.

48.     A collective action will result in an orderly and expeditious administration of the group members' claims, and economies of time, court resources, effort and expense, and uniformity of decisions will be assured.

### IV.  JURISDICTION AND VENUE

49.     This Court has jurisdiction over Gray's FLSA and FMLA claims under 28 USC § 1331 as those FLSA and FMLA claims raise questions of federal law.  See 29 USC § 201 et seq. Additionally, this Court has jurisdiction over Gray's Indiana breach of contract claim under 28 USC § 1332 because there is complete diversity of citizenship between Gray (Indiana) and Danisco (Missouri and Kansas) and because the amount in controversy in the breach of contract action (lost wages totaling more than $75,000 over 11 month balance of contract), as alleged hereinabove, exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

50.     This Court is the appropriate venue for this cause of action as Gray worked for Danisco in Vigo County, Indiana and much of the illegal activity took place in the Southern District of Indiana.  28 USC § 1391.

### V.  STATEMENT OF CLAIMS

#### A.  Fair Labor Standards Act Claims

51.     Gray incorporates herein by reference paragraphs 1 through 50 above.

52.     Danisco is an "enterprise" as that term is defined by the FLSA, and Danisco is covered by the overtime and minimum wage provisions of the FLSA.  Danisco is an "employer," as that term is defined by the FLSA.  Finally, Danisco is a "person" as that term is defined by the

FLSA.

53.     Danisco committed overtime violations under the FLSA against Gray and all similarly situated hourly paid workers, as earned, regularly paid categories of wages called 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" should have been included in employees' regular rates of pay and included in any calculation of overtime compensation due to Gray and each and every similarly situated class member in each and every week in which both overtime compensation and one or more of the 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" types of wages were owed or paid.

54.     Because it failed to include earned 1) "Healthy Inc Credit" aka "HIMedCr," 2) "LPBC Annual - Acti" or "LPBCAnnA," and 3) "R. AwdGl 1" wages in its calculation of overtime compensation, Danisco failed to pay Gray and each and every similarly situated coworker at the full and correct overtime rate of pay, as required by the FLSA, in any and all calendar weeks in which Gray and/or every similarly situated coworker worked in excess of forty (40) hours.

55.     Additionally, Danisco has repeatedly violated the FLSA's overtime provisions by failing to pay Gray and each similarly situated coworker at full overtime rates of pay for every overtime hour worked.

56.     Danisco's failure to comply with the FLSA's provisions regarding overtime compensation has been willful and without justification, and subjects Danisco to a three year statute of limitations.

57.     Gray and the Plaintiff Class seek all available damages, including unpaid wages,

unpaid overtime compensation, liquidated damages, payment of reasonable attorney's fees, costs and expenses, and any and all other damages to which they may be entitled for Danisco's violations of their rights under the Fair Labor Standards Act.

### B. Gray's Individual Breach of Contract Claim

58.     Gray hereby incorporates by reference the allegations stated in rhetorical paragraphs 1 through 57 of the Complaint for Damages as set forth herein.

59.     Gray's breach of contract claims are made under Indiana law.  Gray's breach of contract claims are based upon Danisco's failure to honor the written terms of its July 27, 2021 Last Chance Agreement, its breach of that Last Chance Agreement when it terminated Gray without cause, without explanation and without substantiation that Gray had violated any term or provision of that Last Chance Agreement.

60.     Danisco continues to breach its Last Chance Agreement as it fails and refuses to permit Gray to work, fails and refuses to pay Gray his full wages and benefits through the end of the one year term of the Last Chance Agreement (July 26, 2022), and otherwise fails to honor the promises Danisco made to Gray in the Last Chance Agreement.

61.     Gray has been harmed and incurred damages as a result of Danisco's failure to honor its employment agreement with him, failure to pay him all wages and benefits owed under the contract, and failure to comply with the terms of the July 27, 2021 Last Chance Agreement.

### C. Gray's Individual FMLA Interference Claim

62.     Gray incorporates herein by reference paragraphs 1 through 61 above.

63.     By way of this Complaint, Gray asserts that he is a covered and eligible employee under the Family and Medical Leave Act (hereinafter "FMLA"), who worked at least one

thousand two hundred and fifty (1,250) hours in the twelve (12) months preceding his notice to Danisco that he would need to take medical leave covered by the FMLA (when he let his supervisors know or they became aware Gray needed knee surgery and medical leave to recover).  Moreover, Gray had worked well over one year for Danisco (and its predecessors) prior to the time he provided his supervisors sufficient notice that he needed a knee surgery and medical leave to recover, and, therefore had need for medical leave that would be covered by the FMLA.

64.     Gray's eligibility for leave under the FMLA stems from his employment at Danisco in Terre Haute, Indiana.  Danisco has and had far more than fifty (50) employees working for it within a seventy-five (75) mile radius of the Terre Haute, Indiana location from which Gray worked at all times relevant (meaning, calendar years 2021 and 2020).  Danisco was and is an employer under the definition of the FMLA and Gray was an eligible employee with Danisco.

65.     Gray's own serious health condition - his left knee injury, need for surgery and need for recovery lasting far more than three consecutive days - necessitated his need for continuing medical treatment and medical leave.  Gray properly and sufficiently notified his supervisors that he would need knee surgery and medical leave.  Further, Gray properly notified Danisco supervisors in writing (an email) that he wanted a FMLA application.  All FMLA activity sought medical leave for Gray to care for his own serious health condition.

66.     Danisco wrongfully and illegally violated Gray's substantive FMLA rights and interfered with Gray's right to use his FMLA leave to protect and preserve his employment, particularly as Danisco refused to preserve Gray's employment.

67.     As a direct and proximate result of Danisco's conduct, Gray has sustained substantial economic losses, including, but not limited to, career damage and past and future loss of wages and other economic benefits.  By way of this Complaint, for Danisco's violations of the FMLA, Gray is seeking all available damages, including, but not limited to, liquidated damages, back pay and benefits, reinstatement or front pay and benefits, all of his attorney's fees, costs and expenses, and any other damages necessary to remedy Danisco's violations of Gray's rights under the FMLA.

68.     Gray was wrongfully terminated from his employment with Danisco while (and for) attempting to exercise his right to use FMLA leave.  Gray's exercise of his FMLA rights was a primary factor which improperly motivated Danisco to terminate his employment.  Said wrongful termination of Gray's employment is prohibited by 29 U.S.C. § 2615.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Gray respectfully requests that the Court enter judgment against Danisco and issue all available relief to him, individually, and to all eligible members of the FLSA Class, including, but not limited to, the following:

1.     All damages available under the FLSA, including all unpaid overtime wages, all liquidated damages, and payment of all reasonable attorney's fees, costs and expenses;

2.     All unpaid and underpaid wages;

3.     All reasonable attorney's fees and expenses;

4.     All lost wages and benefits through the last day of the term of Gray's one year contract with Danisco;

5.      All damages available under the FMLA,  including all back pay and benefits, all

available liquidated damages, reinstatement and/or front pay and benefits, and

payment of all reasonable attorney's fees, costs and expenses;

6.      Costs;

7.      Prejudgment interest, if available; and

8.      Any and all other relief just and proper in the premises.

Respectfully submitted,

HASSLER KONDRAS MILLER LLP


By/s/Robert P. Kondras, Jr.
Robert P. Kondras, Jr.
Attorney No. 18038-84
100 Cherry Street
Terre Haute, IN 47807
(812) 232-9691
Facsimile: (812) 234-2881
kondras@hkmlawfirm.com


### REQUEST FOR TRIAL BY JURY

Comes now Plaintiff Russell E. Gray III, by counsel, and requests a trial by jury on all

issues which may be tried to a jury.


Respectfully submitted,

HASSLER KONDRAS MILLER LLP

By  /s/Robert P. Kondras, Jr.
        Robert P. Kondras, Jr.
        Attorney No. 18038-84
        100 Cherry Street
        Terre Haute, IN 47807
        (812) 232-9691
        Facsimile: (812) 234-2881
        kondras@hkmlawfirm.com